856 F.2d 1412
 12 Fed.R.Serv.3d 412
 David W. CASSIDY, Plaintiff-Appellee,
v.
Juan C. TENORIO; Juan C. Tenorio & Associates, a Guam
Corporation; Juan C. Tenorio & Associates, a corporation
organized under the laws of the Commonwealth of the Northern
Mariana Islands, Defendants-Appellants.
 No. 87-2217.
 United States Court of Appeals,
Ninth Circuit.
 Submitted April 4, 1988.*
Decided Sept. 12, 1988.
 
 Jeffrey R. Siegel, Gill & Siegel, Agana, Guam, for defendants-appellants.
 G. Patrick Civille, Moore, Ching, Boertzel & Lawlor, Agana, Guam, for plaintiff-appellee.
 Appeal from the United States District Court for the District of Guam.
 Before WALLACE, REINHARDT and NOONAN, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Tenorio appeals from the decision of the Appellate Division of the District Court of Guam, affirming the Guam Superior Court's denial of his motion to set aside a default judgment and denial of his motion for reconsideration. We have jurisdiction pursuant to 28 U.S.C. Sec. 1292 and 48 U.S.C. Sec. 1424-3(c), and we affirm.
 
 
 2
 * Cassidy and Tenorio were business partners who jointly owned and operated several small corporations in Guam and Saipan. Among these corporations was a travel agency, Taga Travel, Inc. (Taga Travel), with offices in both Guam and Saipan. Together with a third director and shareholder of Taga Travel, Cassidy and Tenorio executed on February 11, 1983, a guaranty to the Bank of Guam (the Bank) in order to secure a $200,000 line of credit for Taga Travel. Under the terms of the guaranty, the three signatories jointly and severally guaranteed the loans that Taga Travel borrowed pursuant to this credit facility.
 
 
 3
 Prosperity, unfortunately, did not smile upon Taga Travel. By April 1983, Taga Travel's financial situation had deteriorated to the point where the Bank demanded that Cassidy honor the $200,000 guaranty to repay sums that Taga Travel took out under its line of credit. To honor this guaranty, on February 14, 1984, Cassidy obtained a personal loan from the Bank for $200,000, at 18% interest, the proceeds of which were used to repay Taga Travel's debt to the Bank.
 
 
 4
 On October 4, 1985, Cassidy wrote Tenorio demanding that Tenorio indemnify him for $100,000, half of the amount that Cassidy had paid to the Bank on behalf of Taga Travel. Cassidy requested that Tenorio contact him by October 18, 1985, to discuss the matter and unequivocally threatened to take necessary legal action if the two of them could not agree upon a satisfactory settlement by that date. In a follow-up letter dated October 9, 1985, Cassidy informed Tenorio that he had retained the services of a law firm, renewed his previous demand for indemnification in the amount of $100,000, and assured Tenorio that, upon payment of this sum, the two of them would then have a cause of action for contribution from the third co-guarantor of Taga Travel's debts to the Bank. As with his earlier correspondence, Cassidy concluded this letter by threatening to take legal action to seek contribution from Tenorio for these debts if some accommodation was not reached by October 18, 1985.
 
 
 5
 Tenorio eventually visited Cassidy's lawyer, Boertzel, in late October or November of 1985 to discuss Cassidy's claim for contribution. During this meeting, Boertzel and his partner, Moore, inquired about Tenorio's assets and began negotiating with him regarding Cassidy's demand for contribution. Boertzel delivered to Tenorio, on December 9, 1985, a Forbearance and Reimbursement Agreement, which allegedly incorporated the terms of the understanding reached during their prior encounter. Under this agreement, Tenorio would sign a promissory note in which he would promise to pay Cassidy his $100,000 share according to a specified schedule of payments, in exchange for a promise by Cassidy to forbear from taking legal action against him. The cover letter accompanying the proposed agreement requested that Tenorio schedule an appointment with Boertzel so that the documents could be signed by December 13, 1985.
 
 
 6
 On December 18, 1985, Boertzel spoke with Tenorio by telephone about finalizing the arrangement. Acting upon Boertzel's advice, the following day Tenorio contacted attorney Perez to represent him in his negotiations with Cassidy. Because he was leaving town, Perez called Boertzel to request a two-week extension of the deadline for consummating the deal. That same day, a letter was hand delivered to Perez in which, upon Cassidy's orders, Boertzel denied the request for an extension on the grounds that Cassidy "has been negotiating with Mr. Tenorio since early October on this matter" and that, "[i]n the intervening period, Mr. Tenorio has had ample opportunity to consult with counsel." Perez was then advised that December 27, 1985, one week later, was the new deadline for signing the Forbearance and Reimbursement Agreement.
 
 
 7
 On the following day, December 20, 1985, Tenorio executed the Forbearance and Reimbursement Agreement. In so doing, he signed a promissory note to Cassidy and also signed guarantees by two corporations under his control.
 
 
 8
 On February 5, 1986, Boertzel wrote Tenorio notifying him that he was in default under the terms of the promissory note and the Forbearance and Reimbursement Agreement. Boertzel also warned Tenorio that unless these defaults were cured by February 11, 1986, Cassidy would "exercise his rights under the aforementioned documents." On February 11, Tenorio requested an extension of time in order to seek legal counsel. When Boertzel wrote back on February 13, he recognized that "it is certainly your right to retain counsel to advise you regarding your obligations under the guaranty and security agreements, the forbearance agreement, and the promissory note which you executed on December 20, 1985," but informed Tenorio that Cassidy refused to grant any extensions of time. In addition, Boertzel pointed out that Tenorio was now guilty of additional breaches of his obligations under the agreements, but granted an additional ten days within which to make good on these latest defaults.
 
 
 9
 When no cure was forthcoming, Cassidy filed suit in the Superior Court of Guam on March 24, 1986, against Tenorio and his two corporations that had executed guarantees on his behalf. The complaint alleged that Tenorio was in default under the terms of the promissory note that he executed on December 20, 1985. Although the defendants were properly served on March 27, 1986, no answer or other responsive pleading was filed. Cassidy thereafter moved for a default judgment on April 18, 1986. Default was then entered against Tenorio and his two corporations by the Clerk of the Court on April 25, 1986. A Judgment of Default was subsequently entered by the Superior Court on April 28, 1986.
 
 
 10
 Tenorio, represented by a new attorney, filed a motion to set aside the default judgment on May 23, 1986, alleging that his default was not willful and that he had meritorious defenses to enforcement of the promissory note. Cassidy opposed the motion, and on June 27, 1986, following a hearing, the trial court denied the motion. Shortly thereafter, on July 10, 1986, Tenorio filed a motion to reconsider the court's earlier decision. Ruling from the bench, the court denied this motion. A formal decision and order denying Tenorio's motion for reconsideration was entered on August 22, 1986. In neither instance was the trial court requested to state specific reasons for the ruling.
 
 
 11
 On appeal, the Appellate Division of the District Court of Guam held that it was not an abuse of discretion for the trial court to deny both Tenorio's motion to set aside the default judgment and his motion to reconsider. Applying the test that we articulated in Falk v. Allen, 739 F.2d 461 (9th Cir.1984) (per curiam) (Falk ), the Appellate Division found that because the default was the result of Tenorio's own culpable conduct, and because no evidence of a meritorious defense appeared in the record, the denial of the two post-judgment motions was proper.
 
 
 12
 Tenorio timely appeals to this court, arguing that the trial court abused its discretion in its two rulings. The Appellate Division reviews a trial court's decision denying a motion for relief from judgment for an abuse of discretion. Id. at 462. We in turn review the decisions of the Appellate Division de novo. Guam v. Yang, 850 F.2d 507, 511 (9th Cir.1988) (en banc).
 
 II
 
 13
 Tenorio brought his motion to set aside the default judgment under Rule 55(c) of the Guam Rules of Civil Procedure. Like Fed.R.Civ.P. 55(c), Guam Rule 55(c) provides that "[f]or good cause shown, the court may set aside the entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." (Emphasis added.) Just like Fed.R.Civ.P. 60(b), Guam Rule 60(b) permits the trial court to relieve a party from a final judgment for "mistake, inadvertence, surprise, or excusable neglect," or "fraud ..., misrepresentation or other misconduct of an adverse party."
 
 
 14
 Rulings on motions for relief from judgment brought pursuant to Fed.R.Civ.P. 60(b) are committed to the sound discretion of the trial court; accordingly, they are reviewed for an abuse of discretion. Thompson v. Housing Authority of the City of Los Angeles, 782 F.2d 829, 832 (9th Cir.), cert. denied, 479 U.S. 829, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986). Because Guam R.Civ.P. 60(b) is identical to Fed.R.Civ.P. 60(b), we will apply Ninth Circuit law and review the Superior Court's denial of the motions for relief under the Guam provision for an abuse of discretion. Guam v. Yang, 850 F.2d at 512 n. 8 ("We interpret Guam statutory provisions that track ... Federal Rules ... in the same way that we interpret the Federal Rules.").
 
 
 15
 For the same reason, we will apply the same standard that we apply in reviewing a district court's decision to grant or deny a motion brought under Fed.R.Civ.P. 60(b) to reopen a default judgment in determining whether the trial court abused its discretion in this case. In Falk, we identified three factors that should be evaluated in considering a motion to reopen a default judgment: (1) whether the plaintiff will be prejudiced, (2) whether the defendant has a meritorious defense, and (3) whether culpable conduct of the defendant led to the default. 739 F.2d at 463. This tripartite test is disjunctive. Hence, a finding that the plaintiff will be prejudiced, or that the defendant lacks a meritorious defense, or that the defendant's own culpable conduct prompted the default is sufficient to justify the district court's refusal to vacate a default judgment. Meadows v. Dominican Republic, 817 F.2d 517, 521 (9th Cir.1987); Pena v. Seguros La Comercial, S.A., 770 F.2d 811, 814-15 (9th Cir.1985).
 
 
 16
 Tenorio bears the burden of proving the existence of a justification for Rule 60(b) relief, see Atchison, Topeka and Santa Fe Railway Co. v. Barrett, 246 F.2d 846, 849 (9th Cir.1957), including the existence of a meritorious defense. See Hawaii Carpenters' Trust Funds v. Stone, 794 F.2d 508, 513 (9th Cir.1986); Ellingsworth v. Chrysler, 665 F.2d 180, 184 (7th Cir.1981); In re Stone, 588 F.2d 1316, 1319 (10th Cir.1978) (Stone ). On a motion under Rule 60(b), we will accept as true the movant's factual allegations. Falk, 739 F.2d at 464; Stone, 588 F.2d at 1319. "[M]ere legal conclusions, general denials, or simple assertions that the movant has a meritorious defense" are, however, insufficient to justify upsetting the underlying judgment. Stone, 588 F.2d at 1319.
 
 
 17
 The trial court was not explicit as to which of the Falk factors was persuasive. To assure he had a proper record on appeal, Tenorio should have but did not request specific findings. We thus inquire whether the evidence warranted the trial court's implied finding that one of the Falk factors dictated dismissal. Tenorio argues that the trial court erred in rejecting his claim that he had a meritorious defense to the underlying action. After reviewing the entire record, we have concluded that the dismissal was based on this ground. We review the court's decision under an abuse of discretion standard. Our inquiry must therefore focus on whether there was evidence before the trial court warranting a conclusion that Tenorio did not have a meritorious defense.
 
 
 18
 Tenorio alleges that he was cajoled into signing the promissory note and forbearance agreement through fraud or undue influence by Cassidy and Cassidy's attorney, Boertzel. Tenorio, however, does not explain how he was defrauded by either Cassidy or Boertzel. He does not allege that he was misled as to the terms of these agreements. Nor does he suggest that his signature on any of the documents was procured through fraudulent misrepresentations concerning their nature. Indeed, he merely avers, without identifying any supporting evidence, that "possible fraud" exists. Such a naked, conclusory allegation, without a statement of underlying facts which tend to support such an allegation, is insufficient to make out a colorable claim to a meritorious defense. See Stone, 588 F.2d at 1319.
 
 
 19
 Tenorio also maintains that his assent to the agreements was obtained as the result of the "undue influence" of Cassidy and Boertzel. Relying on Guam Civil Code Sec. 1575,[1] Tenorio suggests that his prior dealings with Cassidy and Boertzel established such a relationship of trust and confidence between them as to subject him unjustly to their undue influence.
 
 
 20
 With respect to Cassidy, Tenorio maintains that their numerous joint business ventures established a confidential relationship that created the potential for Cassidy to exert undue influence over him. Even if we were to assume that under Guam law a mere professional business relationship can create a confidential or fiduciary relationship in appropriate circumstances, we have been unable to find a scintilla of evidence in the record that Cassidy unfairly exploited his relationship with Tenorio to procure Tenorio's signature on the agreements. All that Cassidy did prior to the execution of these agreements was demand that Tenorio reimburse him $100,000 and retain a law firm. Cassidy then threatened legal action against Tenorio if he did not comply with the demand. We are aware of no authority suggesting that the mere threat of a lawsuit, without more, can constitute undue influence as between two experienced businessmen.
 
 
 21
 Although Tenorio attempts to buttress his claim of undue influence with allegations that Cassidy had control over Tenorio's business properties and that Cassidy unilaterally caused Taga Travel to end in bankruptcy, he does not draw a connection between these acts and his signing the promissory note. While filing bankruptcy without Tenorio's prior knowledge and approval could conceivably subject Cassidy to a lawsuit by Tenorio in his capacity as a shareholder and director of Taga Travel, we do not see how it demonstrates undue influence by Cassidy resulting in the execution of the agreements.
 
 
 22
 Tenorio also argues that there was a confidential relationship between himself and Boertzel that resulted in his signing the documents. In his affidavit, Tenorio predicates the existence of this second confidential relationship on his alleged friendship with Boertzel and on the various social relationships among their wives and daughters. Again, even if we were to assume that casual friendships and social relations can create a confidential business relationship under the law of Guam, Tenorio does not show how he was unduly influenced by any words or actions of Boertzel. Tenorio's only argument is based on the allegation that during their telephone conversation of December 18, 1985, Boertzel led him to believe that his interests were being protected, even though Boertzel knew that Tenorio was not being represented by counsel. This allegation, however, is insufficient.
 
 
 23
 Tenorio asks us to assume that it is objectively reasonable for an experienced businessman like Tenorio, who controls several corporations, to rely naively on the words of opposing counsel. But we need not get that far. Here, Tenorio does not ever identify what words were spoken by Boertzel that led him to believe that Boertzel was looking out for his interests. Further, his claim of reliance on Boertzel's assurances appears inconsistent with his claim that he was "intimidated and scared" during his conversation with Boertzel.
 
 
 24
 In addition, Tenorio's suggestion that he was lulled into a vulnerable position by Boertzel's reassurances is inconsistent with Tenorio's admission that during that same telephone conversation, he brought up the subject of obtaining independent legal advice and that, in response, Boertzel referred him to an attorney, whom Tenorio consulted the very next day. Boertzel, moreover, avers that during their discussions prior to the signing of the agreements on December 20, 1985, he "made a clear and special effort to make absolutely certain that Mr. Tenorio understood that I represented only David Cassidy and that I did not represent Mr. Tenorio," and that he advised Tenorio to look elsewhere for legal counsel. Indeed, in his memorandum of points and authorities in support of his motion to set aside the default judgment, Tenorio explicitly concedes that during the period between December 13, 1985, and December 20, 1985, Boertzel advised him that "retaining an attorney may be wise." Further, when Tenorio went to Boertzel's office on December 20, 1985, he admits that "Boertzel made it clear that he represented Cassidy." Under the totality of these circumstances, we can see why the trial court would reject the contention that Tenorio could claim to be under the undue influence of Boertzel or to have been justifiably lulled into forgoing his right to seek independent legal representation.
 
 
 25
 Finally, Tenorio suggests that, even in the absence of a confidential relationship, because Cassidy and Boertzel knew he was not represented by legal counsel, the constant pressure applied by them to prompt him into executing the promissory note and forbearance agreement constituted undue influence. Relying on Odorizzi v. Bloomfield School District, 246 Cal.App.2d 123, 54 Cal.Rptr. 533 (1966), Tenorio maintains that "[u]ndue influence, in the sense that we are concerned with here, is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment.... The hallmark of such persuasion is high pressure, a pressure which works on mental, moral, or emotional weakness to such an extent that it approaches the boundaries of coercion." Id. at 130, 54 Cal.Rptr. 533 (citation omitted).
 
 
 26
 Assuming without deciding that Guam would adopt the test for "undue influence" announced in Odorizzi, we conclude that Tenorio has not alleged facts from which the "weakness of mind" necessary to establish undue influence could be inferred. See id. at 133, 54 Cal.Rptr. 533. Odorizzi recognized that "weakness of mind" in this sense and within the meaning of undue influence generally requires such sickness, senility, or old-age as to incapacitate a person's ability to understand the consequences of his actions. See id. at 131, 54 Cal.Rptr. 533. Tenorio does not allege any such incapacity. Although Odorizzi extended the undue influence doctrine to other forms of extreme mental and emotional incapacity, Tenorio clearly does not fall into this expanded category. In Odorizzi, the California Court of Appeal acknowledged that a person who "was under severe mental and emotional strain at the time because he had just completed the process of arrest, questioning, booking, and release on bail and had been without sleep for forty hours" could be mentally incapable of exercising his judgment when he resigned from his teaching post after being approached by his superiors and encouraged to do so. See id. That case, moreover, involved affirmative representations by the other party that there was no time to consult an attorney, and that, if Odorizzi did not resign at once, the school district would suspend and dismiss him from his position and publicize the arrest and criminal proceedings that had been brought against him and cause him "to suffer extreme embarrassment and humiliation." Id. at 127, 135, 54 Cal.Rptr. 533. Here, Tenorio fails to allege facts that demonstrate any mental or emotional impairment remotely approaching that involved in Odorizzi. Nor does he allege that Cassidy or Boertzel advised him not to seek legal counsel or that they resorted to threats other than threats of resorting to legal action.
 
 
 27
 Moreover, we fail to see anything irregular about the pressure that was applied on Tenorio to enter into an arrangement with Cassidy that would avert a lawsuit. Cassidy notified Tenorio as early as October 4, 1985, regarding his demand for reimbursement and his necessary recourse to legal action if his demand was not satisfied. Thus, Tenorio was on fair notice that a major legal dispute with his business associate had commenced. Yet Tenorio did not seek legal advice. Five days later, Cassidy reiterated his demand in a follow-up letter. Once again, Tenorio does not allege that he attempted thereafter to retain the services of an attorney. When Tenorio visited Boertzel's law office in late October or November of 1985, he apparently negotiated with Boertzel regarding the terms of an accommodation with Cassidy. Still, Tenorio failed to obtain legal advice. A draft of the forbearance and reimbursement agreement was sent to Tenorio on December 9, 1985. Tenorio thus had 11 days in which to inspect the document and seek legal advice prior to signing it on December 20, 1985. Nonetheless, although more than two months had transpired since Cassidy first made his demand for reimbursement on October 4, 1985, Tenorio still had not taken steps to secure legal representation.
 
 
 28
 Tenorio further admits that, pursuant to Boertzel's advice, he consulted attorney Perez on December 19, 1985, regarding the forbearance agreement proposed by Cassidy. Although Cassidy, acting through Boertzel, had provided in writing that Tenorio had until the close of business on December 27, 1985, to execute the forbearance agreement, Tenorio signed the agreement on December 20, 1985. No explanation has been proffered by Tenorio as to why he did not take advantage of the additional seven days prior to the deadline to seek additional legal advice. Under the circumstances, the record does not support the claim that the alleged pressure that Tenorio felt as a result of approaching the bargaining table without benefit of counsel was not due to any undue influence by Cassidy or Boertzel.
 
 
 29
 We thus conclude that the record does not support Tenorio's claim of fraud or undue influence. Because he alleges no other defenses to Cassidy's action to collect on the promissory note, under Falk, we hold that the superior court did not abuse its discretion in denying Tenorio's motion to set aside the default judgment. Moreover, because no new grounds for relief were presented in his motion to reconsider, we also uphold the superior court's denial of that motion.
 
 
 30
 AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34-4 and Fed.R.App.P. 34(a)
 
 
 [1]
 Guam Civil Code Sec. 1575 (1970) provides in pertinent part that "[u]ndue influence consists":
 
 
 [1]
 In the use, by one in whom confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him;
 
 
 [2]
 In taking an unfair advantage of another's weakness of mind; or,
 
 
 [3]
 In taking a grossly oppressive and unfair advantage of another's necessities or distress