**Ahmed AL–TORKI, Plaintiff–Counter-Defendant–Appellant,**

v.

**Dr. Charles E. KAEMPEN, Defendant-Counter–Claimant–Appellee,**

v.

**Inger M. KAEMPEN; Kaempen & Associates, Defendants-Appellees.**

No. 94–55538.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1995.

Decided March 5, 1996.

R. Stephen Duke, Law Offices of Rodney T. Lewin, Beverly Hills, California, for plaintiff-counter-defendant, appellant.

Charles E. Kaempen, Orange, California, in pro per, for defendants-counter-claimants, appellees.

Before: HUG, BEEZER, and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge.

The issue in this appeal is whether an order for a new trial is reviewable, if the party who prevailed at the first trial has his claims dismissed for failure to prosecute in the second.

## FACTS

Kaempen invented and patented technology for fiberglass pipes useful in the oil industry. In March 1982, Al–Torki and Kaempen entered into a contract granting Al–Torki an exclusive license in certain countries to the patented technology. The parties called this the "Muslim Contract," because the countries in which Al–Torki was to enjoy exclusive rights were Muslim. This contract was not the one litigated.

Later in 1982, Kaempen solicited money from Al–Torki to exploit his patents worldwide. In the course of negotiations, conducted mostly by telex between Kaempen in California and Al–Torki in Saudi Arabia, Al–Torki sent Kaempen $135,000. Al–Torki claimed that this money constituted loans and payments in exchange for shares of the new company which was to have exclusive rights worldwide. Kaempen claimed that the money constituted loans, advances against the possibility of agreement, gifts, and advances on royalty payments to come due in the future under the Muslim contract, and took the position that the parties had not agreed upon a contract for worldwide exploitation of the patents.

During the time he was negotiating and taking money from Al–Torki for the worldwide exclusive rights, Kaempen sold the worldwide exclusive rights, except for the Muslim countries, to a second company. Kaempen took the position that Al–Torki's deal, if there was to be one, would include Al–Torki's paying for litigation against the second company to which Kaempen had sold the rights. Kaempen did not send Al–Torki his money back. Kaempen subsequently sold the same rights to a third company, and then a fourth.

Al–Torki sued Kaempen and the fourth company to which Kaempen had sold the worldwide rights for specific performance, damages, interference with prospective advantage, conversion (for taking his money improperly), and other wrongs. Kaempen counterclaimed for breach of contract, claiming that Al–Torki owed him the litigation expenses for Kaempen's lawsuit to get out of his deal with the second company to which he had sold the rights.

The case went to jury trial, and Al–Torki won. Al–Torki and Kaempen both testified and were the only witnesses. After five days of trial and three of deliberations, the jury returned a verdict in favor of Al–Torki for $715,000 compensatory damages and $500,000 punitive damages.

Kaempen filed a motion for a new trial, based on insufficiency of the evidence. The trial judge granted the motion, on the ground that the evidence was insufficient to establish a binding contract. The judge said that there was no evidence of a meeting of the minds, and expressed strong feelings that the verdict was erroneous.

The trial judge then *sua sponte* recused himself in a written order "by reason of strongly held feelings about verdict." The case was then reassigned from Judge Williams to Judge Letts. Judge Letts set the matter down for a retrial.

The court issued an order, after Kaempen's lawyer moved for leave to withdraw, for an "informal status conference," at which "clients *and* counsel are ordered to be present." The lawyers were there, and subsequently the court issued an order for another conference, and wrote, "The plaintiff and defendants are required to attend the Pre–Trial conference in person." The parties stipulated to a continuance, because Al–Torki resided in Saudi Arabia and planned to be on a haj to Mecca at that time, and Kaempen also wanted a continuance.

The parties then stipulated to a continuance of the pretrial conference and trial, scheduled a week apart. The reason was Al–Torki's serious heart condition, which prevented travel. Al–Torki filed medical reports from physicians and a hospital, showing that he had had coronary artery surgery and was under medical care for severe coronary artery disease not remedied by the surgery. He said he was under medical advice "not to go to the United States, and to avoid all stresses and exertion of any kind." He sought to have the trial continued until after his angiography. Medical reports attached to Al–Torki's papers showed that he was admitted to a hospital in London during the month he was supposed to go to Los Angeles.

Subsequently, Al–Torki's physician reported that he expected Al–Torki to be able to go to his rescheduled trial in Los Angeles, but he wanted to reassess him before he went. Meanwhile, the court denied in part Kaempen's motion for summary judgment, finding that there were triable issues of fact.

The day before the scheduled pretrial conference at which Al–Torki had been ordered to appear, a week before trial, Al–Torki faxed a letter to the trial judge. The letter expressed dissatisfaction with his attorneys, and with the theory on which the case was being litigated. Al–Torki wrote, "I never gave consent to have the Kaempen agreement arbitrated outside London or Geneva," and his attorneys had "neglected the binding clause in the Kaempen International Agreement which stipulated arbitration in London or Geneva." Al–Torki's lawyer moved for leave to withdraw and for a continuance so that Al–Torki could find another lawyer, mentioning that Kaempen now had a new lawyer funded by yet another company to which he had again sold the international rights. Because of the great age of the case, the judge denied the continuance. He ruled, "Get him here, get him here now, you're trailing on a day-to-day basis.... He's got to show up.... There are lots of planes; get him on the first plane."

At the time set for trial, Al–Torki's lawyer was there, but not Al–Torki, and his lawyer was evidently not authorized to proceed. His lawyer said, "I cannot put on my best case without my client.... I frankly don't even know what kind of a case to put on because he has told me he accepts my resignation." The court ruled that "you're no longer his counsel." Then, because Al–Torki was not present and available to proceed, was not represented by counsel, and had not appeared for required status conferences, the court ruled that "he's in default." The court then dismissed Al–Torki's complaint with prejudice and granted judgment in favor of Kaempen on the counterclaim, based on Al–Torki's failure to appear.

## ANALYSIS

Al–Torki argues that the district court erred in setting aside his verdict and granting the motion for new trial, both because there was sufficient evidence for the jury to find in his favor, and also because the district judge who decided it should have recused himself on account of bias. He also argues that the district court abused its discretion by dismissing his complaint and granting judgment on the counterclaim based on his failure to appear. We take up the second argument first, because it is dispositive. We do not reach the question of whether the district court erred in setting aside the jury verdict and granting the motion for new trial.

### I.  Al–Torki's failure to appear.

Al–Torki argues that dismissal and default is too harsh a sanction for failure to appear, where the failure is caused by excusable neglect, mistake, or good cause.

■ We review dismissal for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b) for abuse of discretion. *Henderson v. Duncan*, 779 F.2d 1421, 1423 (9th Cir.1986). A default judgment may be set aside for mistake, inadvertence, surprise, excusable neglect, fraud, misrepresentation, or other misconduct of an adverse party. *See* Fed.R.Civ.Proc. 55(c) (incorporating Rule 60(b) standards). We review for abuse of discretion the denial of a motion to set aside entry of default judgment. *Cassidy v. Tenorio*, 856 F.2d 1412, 1415 (9th Cir.1988).

■ A district judge is required to weigh several factors in determining whether to dismiss a case for lack of prosecution. *Henderson*, 779 F.2d at 1423. These factors include: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions." *Id.* There must also be a showing of unreasonable delay. *Id.* The district court is not required to make explicit findings on the essential factors. *Id.* at 1424. Three factors should be evaluated when considering a motion to reopen a default judgment: (1) whether the defendant's culpable conduct led to the default, (2) whether the defendant has a meritorious defense, and (3)

whether the plaintiff would be prejudiced if the judgment is set aside. *Cassidy,* 856 F.2d at 1415. *See also Meadows v. Dominican Republic,* 817 F.2d 517, 521 (9th Cir.1987).

Al–Torki says in his brief that the dismissal should be set aside because he "operated under a mistake and misunderstanding and because he has a meritorious claim." We assume for purposes of discussion that he has a meritorious claim. The jury thought so, and after the previous judge had set aside the verdict, the district court nevertheless partly denied summary judgment to Kaempen and decided there was a triable issue of fact.

■ Our problem with Al–Torki's argument is that we cannot see what evidence there is in the record for his claim of mistake or misunderstanding. The district judge said in response to Al–Torki's lawyer's argument that Al–Torki had lost confidence in his attorney, that the loss of confidence came only after Al–Torki did not fly to California as ordered for pretrial and trial, and that Al–Torki "may be doing something cute." He decided that Al–Torki should not be treated as "a babe in the woods," and that he was "systematically violating court orders." He thought there was a possibility that Al–Torki was attempting to stall the California proceeding until after he had obtained a judgment in some other forum. Al–Torki submitted no evidence that he did not know he was supposed to be in court in California, that he could not for medical, financial or other reasons be in court in California, or that he misunderstood in any way the district court's order to him that he be in court in California at the time set.

Thus the factual predicate for our review must be that Al–Torki knew and understood that his trial was to commence on a certain date, and that the court had ordered him personally to be present for pretrial and trial; that he was able to comply with the court order; that he willfully elected not to comply; and that he failed to appear personally or by counsel at the time his case was called for trial.

■ Dismissal with prejudice and default on counterclaims, for willful and inex-cusable failure to prosecute, are proper exercises of discretion under Federal Rules of Civil Procedure 41(b), 16(f), and the inherent power of the court. *Link v. Wabash R.R. Co.,* 370 U.S. 626, 633, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962); *Malone v. United States Postal Serv.,* 833 F.2d 128, 130 (9th Cir.1987); *Henderson v. Duncan,* 779 F.2d 1421, 1423 (9th Cir.1986); *Kung v. FOM Inv. Corp.,* 563 F.2d 1316, 1318 (9th Cir.1977); *Cunningham v. United States,* 295 F.2d 535, 536 (9th Cir.1961); *DuBose v. Minnesota,* 893 F.2d 169, 171 (8th Cir.1990). Although any such dismissal and default prevents disposition on the merits, and we assume for purposes of discussion that Al–Torki was prejudiced because his case was meritorious, nevertheless the culpability of a willful failure to appear for trial, and the prejudice to the side which does appear for trial, as well as the interference with the court's docket, may be held by the district court to outweigh those factors. *Cassidy,* 856 F.2d at 1415.

■ Failure to appear for trial, without excuse, prejudices an adversary and interferes with the court's docket about as much as any procedural default can. The other side is likely to have spent thousands of dollars getting its lawyers ready to try the case and arranging for witnesses and exhibits to be available. If the trial does not proceed, the money and effort will have been wasted. The judge is likely to have gone to considerable trouble to clear out time from criminal cases, motion hearings, work in chambers, and other matters, for the civil trial. In many cases, though not this one, jurors and witnesses will have been put to great inconvenience. This is no doubt why the inherent power of a court to dismiss with prejudice for failure to prosecute "is of ancient origin." *Link,* 370 U.S. at 630, 82 S.Ct. at 1388 (citing 3 Blackstone, *Commentaries on the Laws of England* 450–51 (1768)).

The dismissal with prejudice and default on counterclaims were appropriate exercises of discretion.

II.   Reviewability of the new trial order.

■ The question remains whether the earlier orders, setting aside the jury verdict and granting the motion for new trial, were

erroneous. Before deciding whether these orders were erroneous, we must decide whether they are, after the dismissal for failure to prosecute, reviewable. Where the dismissal was a sanction, as for failure to prosecute, the case is distinguishable from those cases where the case was properly litigated to a conclusion, and the unsuccessful party then seeks on appeal to challenge the interlocutory order granting a new trial. *Cf. Roy v. Volkswagen of Am., Inc.,* 896 F.2d 1174, *amended,* 920 F.2d 618 (9th Cir.1990); 15B Charles A. Wright et al., *Federal Practice and Procedure* § 3915.5 (2d ed. 1992 & Supp.1995). The case is also distinguishable from one where an appealable order denying arbitration is followed by default. *Cf. Britton v. Co-Op Banking Group,* 916 F.2d 1405 (9th Cir.1990).

We have held that interlocutory orders, generally appealable after final judgment, are not appealable after a dismissal for failure to prosecute, "whether the failure to prosecute is purposeful or is a result of negligence or mistake." *Ash v. Cvetkov,* 739 F.2d 493, 497-98 (9th Cir.1984). *Ash* involved a dismissal without prejudice, but we did not suggest that it mattered whether the dismissal was with or without prejudice. The Eighth Circuit has applied the *Ash* rule where the dismissal was with prejudice. *DuBose,* 893 F.2d at 171. We see no reason to create an intercircuit conflict on this issue. If the dismissal is for failure to prosecute, "whether the failure to prosecute is purposeful or is a result of negligence or mistake," then interlocutory orders cannot be appealed. There is no good reason to allow plaintiff to revive his case in the appellate court after letting it die in the trial court. If he had a good excuse for the failure to prosecute, that would revive the case, including the appealability of interlocutory orders, but he would first have to establish that good excuse, either in the district court or on appeal.

These consequences of dismissal are among the reasons why dismissal has been characterized as a "harsh penalty . . . to be imposed only in extreme circumstances." *Henderson,* 779 F.2d at 1423. If Al-Torki had, substantially before the date set for trial, fired his lawyer and asked for time to get a new one, different issues might arise. Likewise, if Al-Torki had not fired his lawyer, and his lawyer had been prepared to proceed without Al-Torki, different issues might arise. If Al-Torki had moved in timely fashion for a stay pursuant to an agreement to arbitrate in London or Geneva, the case might be different. Had Al-Torki's failure to appear for his second trial resulted from exhaustion of his funds in the first one, or from his heart condition, the case might be different. Had Al-Torki, in a way which did not put his adversary and the court to the burden of preparing for trial, requested that the court enter judgment against him so that he could have a final appealable judgment "at the cost of wagering all on reversal of the new trial order," 15B Charles A. Wright et al., *Federal Practice and Procedure* § 3915.5, then his case might merit a different outcome. *Cf. Deas v. PACCAR, Inc.,* 775 F.2d 1498, 1502-03 (11th Cir.1985); *National Polymer Prods., Inc. v. Borg-Warner Corp.,* 660 F.2d 171, 176-77 (6th Cir. 1981). But none of those possibilities occurred. We have no occasion to decide whether they would require a different outcome. This case presents a simple refusal to appear at the time set for trial. Such a willful failure to appear for trial forfeits a litigant's right to appeal interlocutory orders prior to judgment.

AFFIRMED.